1  **WO**

2

3

4

5

6                  IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9   Danny Sims, and Danny Sims dba Sims)      No. CV 10-356-PHX-MHM
    Geological and Geotechnical Services,)
10  LLC.,                               )      **ORDER**
                                        )
11            Plaintiff,                )
                                        )
12  vs.                                 )
                                        )
13                                      )
    Paramount Gold and Silver Corp., a)
14  Delaware corporation,               )
                                        )
15            Defendant.                )
                                        )
16  _____)

17

18         Currently before the Court are Defendant Paramount Gold and Silver Corp.'s Motion

19  to Dismiss, (Doc. 11), and Motion to Strike Plaintiff's Supplemental Authorities Regarding

20  Response to Defendant's Motion to Dismiss, (Doc. 24); and Plaintiff's Amended Motion for

21  Leave to File Supplemental Legal Authorities. (Doc. 22). Having considered the Parties'

22  briefs and decided that oral argument is unnecessary, the Court issues the following Order.

23  **I.       BACKGROUND**

24         **A.       Procedural History**

25         On February 19, 2010, Plaintiff Danny Sims brought the instant action, alleging

26  breach of contract, promissory estoppel, unfair competition, violation of right of privacy,

27  false designation under the Lanahm Act (15 U.S.C. §1125(a)(1)(A)), late and unpaid wages

28

1   in violation of A.R.S. §§ 23-353 and 355, and unjust enrichment.  (See Doc.  1, Complaint).

2   Plaintiff's causes of action all stem from events related to his employment by Defendant

3   Paramount Gold and Silver Corp.  (Id.).  Defendant filed its Motion to Dismiss on April 29,

4   2010, seeking enforcement of a forum selection clause. (Doc. 11).  Plaintiff replied on May

5   21, 2010, (Doc.  15), and the Motion became fully briefed on June 3, 2010.    (Doc.  18).

6   Subsequently, on July 15, 2010, Plaintiff filed his Amended Motion for Leave to File

7   Supplemental Legal Authorities, seeking leave from this Court to file a sur response /

8   supplemental authority. (Doc. 22).  On July 21, 2010, Defendant filed both its Response to

9   Plaintiff's Motion to Supplement, (Doc.  25). and its own Motion to Strike Plaintiff's

10  Supplemental Authorities Regarding Response to Defendant's Motion to Dismiss. (Doc. 24).

11  Plaintiff responded to the Motion to Strike on August 4, 2010, (Doc. 28), and it became fully

12  briefed on August 20, 2010.  (Doc.  31).

13          **B.      Factual Background**

14          In or around November, 2007, Plaintiff, who is a geologist, began working for

15  Defendant as a consultant.  (Complaint, ¶15).  On March 27, 2008, Defendant granted Mr.

16  Sims 10,000 Paramount stock options with a strike price of $2.50.  (Id. at ¶16).  On April 1,

17  2008, the Parties executed a written employment agreement ("Agreement"), which named

18  Plaintiff as a "Senior Technical Advisor."   For compensation, the Agreement stated that

19  Plaintiff would be: (1) paid $12,000.00 per month ($600.00 per day for 20 days of work); (2)

20  receive  10,000  stock  options,  at  a  price  of  $2.50  per  share,  vesting  on  May  1,  2008,

21  exercisable on or before December 31, 2009; and (3) receive 115,000 stock options to be

22  granted subsequent to fiscal year end (June 30, 2008) upon establishing new equity plan or

23  sooner.  (Doc.  11, Exh.  A, ¶1.2).  The Agreement also provided that either Party could

24  terminate the contract at will upon 30 days written notice and contained a forum selection

25  clause which stipulated that: "This Agreement shall be construed in accordance with the laws

26  of the Province of Ontario and any proceedings arising between the Parties in any matter

27  pertaining to or related to the Agreement shall, to the extent permitted by law, be held in

28  Ontario, Canada.   (Id. at ¶2.1; ¶4.6).

On July 9, 2008, Defendant granted Plaintiff 40,000 shares of Paramount common stock. (Complaint, ¶22). On November 14, 2008, Defendant provided Plaintiff with notice that it would be terminating his employment without cause in 30 days. (Id. ¶ 23). Pursuant to that notice, Defendant terminated Plaintiff on December 15, 2008. (Id. ¶ 24). Defendant, however, rehired Plaintiff on January 1, 2009, full-time under an oral contract in a management position titled "Senior Technical Advisor."   (Id. ¶ 27).

According to Plaintiff, on February 27, 2009, the Parties entered into a new stock option agreement ("Second Agreement"), under which Defendant would provide 75,000 repriced stock options that had not yet been delivered to Plaintiff, and that Defendant would re-price 10,000 stock options that Plaintiff already held. (Id. ¶ 31). Plaintiff, on June 25, 2009, having not yet received any of the stock options that were promised to him pursuant to the Second Agreement, demanded from Defendant delivery of all of the promised stock options. (Id. ¶ 33). On June 26, 2009, Defendant informed Plaintiff that it would not honor the February 27, 2009, stock option agreement. (Id. ¶ 34). Plaintiff, on June 29, 2009, received from Defendant a repricing agreement for the 10,000 stock options that were granted on March 27, 2008.   (Id. ¶ 36). These options were reset to a price of $0.65,  and Plaintiff exercised the 10,000 stock options on June 29, 2009, at a price of $1.49. (Id. ). Plaintiff, on July 8, 2009, due to the dispute over stock options owed, and an ongoing dispute regarding billing practices, resigned from Paramount and submitted a $23,500 invoice for days worked. (Id. ¶ 37). Plaintiff alleges that Defendant refused to pay him $2,500 of the invoice for days worked. (Id. ¶ 38).

After Plaintiff's July 8, 2009, resignation, Defendant continued to list Plaintiff as one of only five of its senior managers on its Investor Presentation, and one of only four of its senior managers on its investor's "one pager," both published on Paramount's corporate website. (Id. ¶40). On July 19, 2009, Defendant updated its Investor Presentation and continued to list Plaintiff as a manager of the corporation, even though he had resigned 11 days earlier. (Id. ¶43). Defendant, sometime in October, 2009, updated its Investor Presentation and removed Plaintiff from the list of managers.   (Id. ¶55). On October 29,

1   2009, Plaintiff demanded Defendant remove Plaintiffs name from its web page and on
2   November 4, 2009, Defendant removed Plaintiff's name from its one pager. (Id. ¶56).

3   **II.    PLAINTIFF'S MOTION TO DISMISS**

4          Although Defendant does not specify, it is clear that its Motion to Dismiss as been
5   brought pursuant to   Fed.R.Civ.P. 12(b)(3), as the sole issue before this Court is the
6   enforceability of a forum selection clause contained in the Agreement.

7          **A.    LEGAL STANDARD**

8          Because Defendant's Motion to enforce the forum selection clause is made pursuant
9   to Fed. R. Civ. P. 12(b)(3), the pleadings need not be accepted as true, Richards v. Lloyd's
10  of London, 135 F.3d 1289, 1292 (9th Cir. 1998), and the court may consider facts outside of
11  the pleadings. Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 324(9th Cir.1996).  In so
12  doing, the trial court must "draw all reasonable inferences in favor of the non-moving party
13  and resolve all factual conflicts in favor of the non-moving party." Murphy v. Schneider
14  National, Inc. 362 F.3d 1133, 1138 (9th Cir. 2004).  As a general rule, forum selection
15  clauses are presumptively valid and should be upheld "absent some compelling reason and
16  countervailing reason." Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972). The party
17  challenging the clause bears a "heavy burden of proof" Id.  Despite this presumption, three
18  circumstances render the enforcement of such clauses unreasonable: "first, if the inclusion
19  of the clause in the agreement was the product of fraud or overreaching; second, if the party
20  wishing to repudiate the clause would effectively be deprived of his day in court were the
21  clause enforced; and third, if enforcement would contravene a strong public policy of the
22  forum in which suit is brought." Richards v. Lloyd's of London, 135 F.3d 1289, 1294 (9th
23  Cir. 1998) (citing and quoting Bremen, 407 U.S. at 12–13, 15, 18).

24         **B.    DISCUSSION**

25         The validity of the forum selection clause does not appear to be at issue in this case.
26  Instead, the primary issue presented is whether Plaintiff's causes of action pertain to or are
27  related to the Agreement, thereby triggering the Agreement's forum selection clause.
28  Plaintiff's argument against application of the forum selection clause is two-fold: (1) when

Defendant terminated Plaintiff on December 15, 2008, it had the effect of rescinding the Agreement; and (2) the stock options at issue in this lawsuit were promised pursuant to the Second Agreement, which did not contain a forum selection clause.   Defendant, disputes both that the Parties rescinded the contract and that they entered into the Second Agreement. These disagreements concern issues of fact.  Evans v. Valley Radiologists, 127 Ariz. 177, 180 (1980) ("In an action on a contract, the question whether one contract has been cancelled and a new contract entered into is a question of fact."); Reed v. McLaws, 56 Ariz. 556, 562 (1941) ("Whether or not there was a rescission of the contract is also a question of fact."). "[I]f the facts asserted by the non-moving party are sufficient to preclude enforcement of the forum selection clause, the non-moving party is entitled to remain in the forum it chose for suit unless and until the district court has resolved any material factual issues that are in genuine dispute."  Id. at 1139.   The Court must determine, therefore, if the facts asserted by Plaintiff are sufficient to preclude enforcement of the Agreement's forum selection clause.

### 1.        Recession or Termination

"To rescind a contract is not merely to terminate it, but to abrogate and undo it from the beginning." Reed, 56 Ariz. at 562.  In other words, recision does not merely "release the parties from further obligation to each other in respect to the subject to the contract, but [works] to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made."  Id. at 562–63.  Plaintiff alleges that the Parties' rescinded the Agreement, thereby negating the forum selection clause therein, alleging in his Complaint.

The sole basis of Plaintiff's position with respect to rescission, however, is an incorrect legal conclusion: "[a] party which terminates an agreement pursuant to a contractual right within that agreement does, indeed, rescind the agreement." Rescission occurs only by "mutual consent," of both Parties to a contract.  Reed, 56 Ariz. at 563.  In other words, "the parties to . . . [a] bilateral contract may decide they are mutually dissatisfied with their agreement . . . and simply call it off."  JOHN EDWARD MURRAY, JR., MURRAY ON CONTRACTS §143(c) (4th ed.  2001) .  In addition to a written contract of

1  rescission, "an intent to rescind a contract may be inferred from acts or a course of conduct

2  of the parties which clearly indicates a mutual understanding that a written contract has been

3  abrogated or terminated."    Webber v. Smith, 129 Ariz. 495, 498 (Ct. App. 1981).

4  Rescission of a contract, however, is importantly different from mere termination. Reed, 56

5  Ariz.  at 562 ("To rescind a contract is not merely to terminate it").  Termination "occurs

6  when a party puts an end to a contract pursuant to a power created by the agreement or by

7  law."   Importantly, when termination occurs, "all executory obligations are thereby

8  discharged, but any right based upon prior breach or performance survives." MURRAY, *supra*,

9  §145(e).

10     In defending against Defendant's Motion, Plaintiff has relied solely on his inaccurate

11  understanding rescission, neither pleading nor marshaling any additional facts that supports

12  his recision allegation. This Court, therefore, finds that Plaintiff has not plead sufficient facts

13  to support its position that the Parties rescinded the Agreement.  Accordingly, to the extent

14  it is applicable, the Agreement's forum selection clauses remains in force.

15                    **2.     Agreement or Second Agreement**

16     Notwithstanding the issue of rescission, Plaintiff asserts that his claims are not

17  predicated on the Agreement, but instead are based on the alleged Second Agreement, which

18  the Parties purportedly entered into on February 27, 2009, and that does not contain a forum

19  selection clause.  As proof of the Second Agreement, Plaintiff relies on a February 27, 2009

20  email chain, which documents an exchange between Plaintiff and Defendant's employee

21  Chris Cruppi.  Defendant disputes the existence of the Second Agreement, arguing that the

22  email chain on which Plaintiff relies is nothing more than a discussion concerning

23  Defendant's obligations to Plaintiff under the Agreement.  The Court does not have to accept

24  Plaintiff's allegation concerning the Second Agreement as true.  In considering whether the

25  Second Agreement exists, however, the Court "is obligated to draw all reasonable inferences

26  in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving

27  party." Murphy, 362. F.3d at 1138.

28     The February 27, 2009 email chain reads as follows:

1    Cruppi:      Dany [Plaintiff], how many stock options did we agree on and how
2                 many have we delivered.
3    Plaintiff:   We agreed on 125,000 for the first year and 10,000 at $2.50 strike price
4                 were delivered with an expiration date of December 31, 2009.  Thanks.
5    Cruppi:      yes i recall I also granted 40,000 shares way back which were to reduce
6                 the options payable.  By my calculations I owe you 95,000 shares then.
7                 Does this make sense?  Also, by resolution of the shareholders the
8                 strike price is now reduced to $0.65
9    Plaintiff:   I think that is 10 too many but otherwise yes.
10   Cruppi:      ok 85,000 then.  will now get to it soon.

11   (Doc 15, Response, Exh. B).  Even when viewed in the light most favorable to Plaintiff, the

12   Court is unable to find that this email chain evidences the formation of a new agreement.

13   Instead, and as Defendant argues, this exchange appears to concern Defendants's obligations

14   to Plaintiff under the terms of the Agreement.  Both Cruppi and Plaintiff make reference to

15   a past agreement: Cruppi asked Plaintiff "how many stock options *did* we agree on and how

16   many *have* we delivered?" and Plaintiff responded with the past-tense phrase "We *agreed*

17   on 125,000 for the first year . . . ."(Id. (emphasis added)).  Tellingly,  the terms of the

18   agreement being discussed appear to be identical to those of the Agreement. The 125,000

19   stock options mentioned by Plaintiff is the total number of options owed to Plaintiff pursuant

20   to the Agreement, and the amount of options Cruppi and Plaintiff agreed were still owed to

21   Plaintiff—85,000—appears to be the same amount still owed to Plaintiff under the terms of

22   the Agreement.  To wit, Plaintiff admits that the 85,000 shares Cruppi agreed to give Plaintiff

23   consisted of 75,000 yet-as-undelivered repriced stock options and 10,000 stock options

24   Plaintiff already held.  (Complaint, ¶31).  The Parties agreed that Defendant owed Plaintiff

25   only 85,000 shares because Plaintiff already received "40,000 shares way back," which likely

26   refers to the 40,000 shares Plaintiff received on July 9, 2008, while the Agreement was still

27   in effect. In arguing that Cruppi's promise to give Plaintiff 85,000 stock options indicates the

28   existence of a new agreement because the figure 85,000 is not found in the Agreement,

1   Plaintiff ignores Cruppi's reference to the 40,000 shares Plaintiff had already received, and

2   that 40,000 plus 85,000 equals 125,000, the very amount of shares owed to Plaintiff under

3   the Agreement.  Perhaps to avoid the glaring symmetry of the purported Second Agreement

4   and the original Agreement, Plaintiff's Complaint alleges that Defendant never provided

5   Plaintiff any of the 115,000 stock options owed to him under the Agreement, seemingly

6   suggesting that the 40,000 shares of stock Defendant gave Plaintiff in July 2009 did not count

7   against Defendant's obligation to Plaintiff pursuant to the Agreement.  (Complaint ¶25).

8   Plaintiff, however, does not explain the basis for this position or address its apparent

9   contradiction with the email exchange on which he relies.

10      The Court, however, need not decide if the February 27, 2009 email exchange is in

11  fact a new agreement, as a subsequent June, 2009 email correspondence between Plaintiff

12  and Defendant's attorney, Karen Hennessey demonstrates that Plaintiff's claims related to

13  unpaid stock options are pertaining to or related to the Agreement.  In a message dated June

14  26, 2009, Plaintiff wrote the following to Hennessey:

15      Karen,

16      Please read my **employment agreement of April 2008**.  I was granted 125,
        000 options that vested in May 2008.  I received 10,000 immediately and
17      received 40,000 granted shares later that year.  **As per the agreement**, the
        remaining options (75,000) which vested in May, 2008, would be granted at
18      the next annual board meeting.  **Mr. Crupi emailed me earlier this year** that
        these options had been set at $0.65 at that meeting.  There is not different
19      terms on those than the 10,000 I received in April 2008.

20  (Doc.  11, exh.  B (emphasis added)).  Not only does Plaintiff explicitly reference the

21  Agreement (i.e. "my employment agreement of April 2008"), by stating that "Mr.  Crupi

22  emailed me earlier this year that *these options* had been set at $0.65 at that meeting," Plaintiff

23  admits that the email exchange between he and Cruppi—the exchange on which is allegation

24  of a Second Agreement are based—concerned Defendant's obligations under the original

25  Agreement (Id. (emphasis added)).  Accordingly, without passing judgment on the existence

26  of the Second Agreement (the existence of which appears to be a highly questionable

27  proposition), the Court finds that any of Plaintiff's claims predicated on the Second

28  Agreement are related to or pertain to the  Agreement, as by Plaintiff's own admission, the

1    February 27, 2009 email chain concerned the Agreement.

2           **3.      Claims governed by the forum selection clause.**

3           The Court must now consider which, if any, of Plaintiff's claims are governed by the

4    forum selection clause.  Defendant alleges that all of Plaintiff's claims are subject to the

5    forum selection clause.  In his Response, Plaintiff does not appear to dispute that his first and

6    second claims would be governed by the forum selection clause (if it applied).  The Court

7    agrees.  Both of these claims are based on Defendant's alleged failure to provide Plaintiff

8    75,000 stock options at a strike price of $.65 pursuant to the Second Agreement and are,

9    therefore, clearly governed by the forum selection clause.  See Part II(B)(2), infra.

10          The picture is less clear, however, with respect to Plaintiff's claims three (unfair

11   competition), four (violation of right of privacy), and five (false designation).   In these

12   claims, Plaintiff alleges damages stemming from Defendant's alleged use of Plaintiff's name

13   and likeness on certain of Defendant's materials and its website after Plaintiff's July 8, 2009

14   resignation from Paramount.  (Complaint, ¶40, 41).  As plead, none of these claims make

15   reference to or are explicitly predicated on either the Agreement or the alleged Second

16   Agreement. Regardless, Defendant argues that these causes of action are related to or pertain

17   to the Agreement because they all depend on whether Defendant compensated Plaintiff for

18   the use of his likeness and name pursuant to the Agreement.  Forum selection clauses can

19   apply both to tort and contract claims, the determinative question being "whether resolution

20   of the [tort] claims relates to interpretation of the contract."  Manetti-Farrow, Inc. v. Gucci

21   America, Inc., 858 F.2d 509, 514 (9th Cir. 1988).  The Court, therefore, must determine if

22   Plaintiff's claims require interpretation of the Agreement.  Id.

23          In support of its position, Defendant relies primarily on Graham Technology

24   Solutions, Inc. v. Thinking Pictures, Inc. , 949 F. Supp. 1427 (N.D. Cal. 1997).  In Graham,

25   the district court considered whether a claim for copyright infringement of software related

26   to interpretation of a contract that had a forum selection clause.  In holding that it did, the

27   Graham court pointed to *specific* sections of the contract that governed ownership of all

28   copyrights to the software in question, finding that the plaintiff's copyright claim could not

1   proceed without first determining ownership pursuant to the contract.   Id.   at 1433–34.

2   Unlike the defendant in Graham, Defendant's contention that resolution of Plaintiff's third,

3   fourth, and fifth claims will require interpretation of the Agreement, is entirely speculative.

4   Despite having a copy of the Agreement and being a party thereto, Defendant has not pointed

5   to a single provision therein that governs the use of Plaintiff's likeness or otherwise

6   explained why it is likely Plaintiff has been compensated for the use of his likeness pursuant

7   to the Agreement.  This omission is especially glaring in light of the fact that Plaintiff seeks

8   relief for Defendant's use of his likeness during a period of time after Defendant had

9   terminated the agreement.  Additionally, as the Court has already mentioned, Plaintiff's

10   pleadings with respect to these claims do not make reference to the Agreement or otherwise

11   rely upon it.  Cf. K&H Mfg. Co. v. Strong Industries, Inc., 2008 WL 65606, *2 (D. Ariz.

12   January 4, 2008) (upholding forum selection clause where non-contract claims made

13   reference to the contract in the pleadings).

14       While a legitimate dispute concerning the necessity of interpreting the Agreement

15   with respect to Plaintiff's non-Agreement based claims would certainly dictate exercise of

16   the forum selection clause, the effect of enforcing a forum selection clause is "dramatic," and

17   a party may not compel such a dramatic result based merely on speculation.  Murphy, 362

18   F.3d at 1139.  In other words, a defendant should not be able to defeat a plaintiff's otherwise

19   legitimate choice of venue merely by alleging without specificity that the plaintiff's non-

20   contractual claims require interpretation of the contract.  Accordingly, the Court is not

21   persuaded at this time that Plaintiff's third, fourth, and fifth claims for relief will require

22   interpretation of the Agreement.  If further development of the evidentiary record during

23   discovery brings facts to light which demonstrate that interpretation of the Agreement will

24   in fact be necessary to these claims, Defendant may file a renewed 12(b)(3) motion at the

25   close of fact discovery.  See Murphy, 362 F.3d at 1139.  Therefore, the Court denies

26   Defendant's motion to dismiss with respect to these three claims, but without prejudice.

27       Plaintiff's Sixth claim for relief, which alleges late and unpaid wages, very clearly

28   does not require interpretation of the Agreement.  Plaintiff alleges that Defendant failed to

1   fully pay Plaintiff's invoice for work done in May and June 2009, and made late payment on

2   what it did pay.  Defendant terminated the Agreement in December, 2008, and therefore it

3   does not appear to govern the time period in question, and other than generalized conclusory

4   statements to the contrary, Defendant has given this Court no reason to find otherwise.

5          Plaintiff's seventh claim for relief is for unjust enrichment, and is plead as an

6   alternative to Plaintiff's first, third, fourth, and fifth claims.  Importantly, Plaintiff alleges that

7   if "Defendant's promise for 75,000 stock options at a strike price of $0.65 is void or

8   otherwise unenforceable, and there is no remedy at law, Defendant cannot justly retain the

9   benefit, and Plaintiff's only available relief is in equity."  Accordingly, it appears that

10  analysis of this claim relates or pertains to the Agreement, as a determination must be made

11  concerning whether Defendant can recover based on the stock options allegedly promised

12  to him, an issue the Court has already found related to the Agreement.  Accordingly,

13  Defendant's Motion is granted as to Plaintiff's seventh claim.

14  **IV.   MOTION TO STRIKE and MOTION TO FOR LEAVE TO FILE**

15        **SUPPLEMENTAL AUTHORITY.**

16         Plaintiff requests leave of this Court to file a surreply to Defendant's Motion to

17  Dismiss.  "Surreplies…are highly disfavored, as they usually are a strategic effort by the

18  nonmoving party to have the last word on a matter." In re Enron Corp. Secs., 465 F.

19  Supp. 2d 687,691 n. 4 (S.D. Tex. 2006) (quoting Lacher v. West, 147 F. Supp. 2d 538,

20  539 (N.D. Tex. 2001). Accordingly, courts will not allow surreplies except "in the most

21  extraordinary circumstances." Beckner v. Astrue, 2007 WL 2013608 *1 (D. Kan. 2007).

22  See also Gen.Elec. Co. v. Latin Am. Imports, S.A., 187 F. Supp 2d 749, 752 n. 1 (W.D.

23  Ky. 2001)("[M]otions for surreplies…will be summarily denied absent extraordinary

24  circumstances."); Atlin v. Mendes, 2008 WL 5422871 *3 (N.D. Tex. 2008) (moving party

25  must set forth "exceptional or extraordinary circumstances warranting a surreply."); *Starr*

26  *v. Cox*, 2008 WL 1914286 *2 (D. N.H. 2008) (it is proper to deny "a motion for leave to

27  file a surreply where the party failed to demonstrate that the case presented extraordinary

28  circumstances warranting the relief sought.").  Plaintiff has failed to point to any

1  extraordinary circumstances that justify his request, and this Court sees none.  Plaintiff
2  had a full and fair opportunity to brief the issues in this case in his Response; his Motion
3  is denied.

4       **Accordingly,**

5       **IT IS HEREBY ORDERED** granting in part and denying in part Defendant's
6  Motion to Dismiss.  (Doc.  11).  Defendant's motion is granted as to Plaintiff's first,
7  second, and seventh claim, but denied as to Plaintiff's third, fourth, fifth, and sixth claims.

8       **IT IS FURTHER ORDERED** denying Plaintiff's Amended Motion for Leave to
9  File Supplemental Legal Authorities.  (Doc.  22).

10      **IT IS FURTHER ORDERED** denying as moot Defendant's Motion to Strike
11 Plaintiff's Supplemental Authorities Regarding Response to Defendant's Motion to
12 Dismiss. (Doc.  24).

13      DATED this 20th day of December, 2010.

14

15

16 _____
17                Mary H. Murguia
                United States District Judge
18

19

20

21

22

23

24

25

26

27

28